# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CASE NO. 4:22-cv-2979 |
| *Plaintiff*, | |
| v. | |
| RAMAS CAPITAL MANAGEMENT, LLC and GANESH H. BETANABHATLA, | |
| *Defendants*. | |

## **DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................iv

SUMMARY OF ARGUMENT ................................................................................3

LEGAL STANDARD.............................................................................................5

FACTUAL BACKGROUND...................................................................................6

ARGUMENT ........................................................................................................8

I.  The Allegations in the Complaint Do Not Plausibly Allege That Defendants Committed Securities Fraud..............................................8

    A.  Defendants' Statement to Investor 1 that They Had "Invested" $25 Million Was Immaterial and Cannot Have Been Fraudulent. ...................................................................................................8

        1.  Taken as a whole, the October Email is not materially false or misleading................................................................9

        2.  Mr. Betanabhatla corrected any misunderstanding in his pre-investment call with Investor 1. .........................................12

    B.  Defendants Were Authorized by the Deal Documents to Use Investor 1's Investment as They Did. ..................................................13

        1.  The SPT is irrelevant—it is not one of the governing documents. ...............................................................................14

        2.  The LPA *is* the Relevant Document, and it grants the Defendants the authority to do what they did...........................16

II.  The Complaint Must Be Dismissed Because It Is Constitutionally Defective...................................................................................................20

    A.  The Formal Order of Investigation Is Defective.................................20

    B.  Because the Commission Enjoys For-Cause Protections from Removal by the President, It Cannot Prosecute this Case. .................23

ii

C.    The SEC Staff Investigating and Prosecuting this Case Perform Officer Functions Without Proper Appointments. ..............................25

D.    Because the SEC Staff Enjoy For-Cause Protections from Removal by the President, They Cannot Prosecute this Case. ...........30

CONCLUSION ..........................................................................................................30

1276279.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. SEC*,
   446 U.S. 680, 686 n. 5 (1980)...........................................................................14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................5

*Bermea v. United Servs. Auto. Ass'n*,
   No. CV SA-06-CA-0423-XR, 2006 WL 8435304 (W.D. Tex. July
   7, 2006) ...........................................................................................................10

*In re BP p.l.c. Sec. Litig.*,
   843 F. Supp. 2d 712 (S.D. Tex. 2012)................................................................6

*Braun v. Eagle Rock Energy Partners, L.P.*,
   223 F. Supp. 3d 644 (S.D. Tex. 2016)..............................................................12

*Cochran v. U.S. Sec. & Exch. Comm'n*,
   20 F.4th 194 (5th Cir. 2021), *cert. granted sub nom. Sec. & Exch.
   Comm'n v. Cochran*, 212 L. Ed. 2d 777, 142 S. Ct. 2707 (2022) ......................20

*Collins v Yellen*,
   141 S. Ct. 1761 (2021)......................................................................................28

*Dieckman v. Regency GP LP*,
   No. CV 11130-CB, 2021 WL 537325 (Del. Ch. Feb. 15, 2021).......................20

*Free Enterprise Fund v. PCAOB*,
   561 U.S. 477 (2010)..........................................................................24, 25, 26, 30

*Iron Branch Assocs., LP v. Hartford Fire Ins. Co.*,
   559 F. Supp. 3d 368 (D. Del. 2021)..................................................................17

*Lucia v. SEC*,
   138 S. Ct. 2044 (2018)..................................................................................28, 29

*Pratt Paper (LA), L.L.C. v. JLM Advanced Tech. Servs.*,
   No. CIV.A. 11-1556, 2013 WL 395815 (W.D. La. Jan. 31, 2013) ....................9

1276279.1

*In the Matter of Ramas Capital Management, LLC,*
   LA-5255 ..............................................................................................21

*S.E.C. v. Jackson,*
   908 F. Supp. 2d 834 (S.D. Tex. 2012) ...................................6, 8, 19

*SEC v. Mapp,*
   240 F. Supp. 3d 569 (E.D. Tex. 2017) ..............................................20

*Seila Law LLC v. CFPB,*
   140 S. Ct. 2183 (2020) ................................................23, 24, 25

*Williams v. WMX Techs., Inc.,*
   112 F.3d 175 (5th Cir. 1997) ...............................................6

**Statutes**

5 U.S.C. §§ 2301-2302 ...................................................................30

5 U.S.C. § 4802 ......................................................................26, 30

15 U.S.C. § 77s(c) ..........................................................................26

15 U.S.C. §78d(b)(1) .......................................................................26

15 U.S.C. § 78u(b) ..........................................................................26

15 U.S.C. § 80b-9(b) .......................................................................26

**Other Authorities**

17 C.F.R. 200.30-4(a)(13) ...............................................................22

Federal Rule of Civil Procedure 9(b) ...............................................6

Federal Rule of Civil Procedure 12(b)(6) .........................................5

U.S. Const., art. 2, Sec. 2 ..................................................*passim*

1276279.1

Defendants Ganesh H. Betanabhatla ("Mr. Betanabhatla") and Ramas Capital Management, LLC ("RCM") respectfully submit this Motion to Dismiss the Complaint filed in this matter by the U.S. Securities and Exchange Commission ("SEC").

Try as one might, one would find no allegation in this purported fraud case that the Defendants pocketed the money they purportedly obtained by fraud. There is a good reason for that: the Complaint is carefully drafted to make good-faith action sound in fraud by selective quotations and clever pleading that confuse by omission. When the facts alleged are unscrambled and the text of the relevant documents (all referenced in the Complaint) is fully fleshed out, one must conclude that the Defendants acted in good faith and had full authority to act as they did. Put differently, even accepting the *factual* allegations as true (as one must on this motion to dismiss), the Defendants defrauded no one.

Specifically: 1) a fraud claim predicated on the use of a single incorrect word in an email cannot be sustained where, in the very same email, the Defendants specifically call the purported victim's attention to its attachments that correct the mistake, which, consequently, renders that incorrect word immaterial and also refutes the allegation of scienter; and 2) it is not fraud to use investor funds in a manner consistent with the governing deal documents.

With that said, we cannot move to dismiss the *entire* Complaint based on its *factual allegations* alone because the SEC fails to mention a fact that would be fatal to its entire enterprise: that Mr. Betanabhatla truly believed that the critical alleged misrepresentation that he made to the sole purported victim here ("Investor 1") was factual, and thus he lacked scienter. As the SEC well knows, Mr. Betanabhatla was a victim of a con by a talented (and seemingly well-connected) grifter in the mode of Anna Delvey, who told him she was investing $25 million of her family's money with him. It may have been naïve, but Mr. Betanabhatla believed her. He sent her thousands of dollars of his own money because he believed her. He told Investor 1 that he had "raised" $25 million because he believed her. And he has now been charged by the SEC with allegedly intentionally deceiving Investor 1 because he believed her.[1]

Independently, the *entire* Complaint must be dismissed as a product of a series of violations of constitutional separation-of-powers principles stemming from: 1) the failure to appoint properly as officers of the United States individuals who wield executive power at the SEC; and 2) the President's inability to remove the relevant SEC officials at will, as the Constitution requires.

---

[1] As the SEC is aware, long after the events described in the Complaint, Mr. Betanabhatla discovered that the woman in question was simultaneously representing herself to him as a Latin American heiress and to others as a Saudi princess, with two LinkedIn accounts to match.

## SUMMARY OF ARGUMENT

Defendants move to dismiss the SEC's Complaint on two bases: first, with one exception, the Complaint does not allege an actionable fraudulent statement; second, the entire Complaint is defective because the SEC's investigation and prosecution of this action violate the Constitution's Appointments Clause.  U.S. CONST. ART. II, § 2.

The SEC's various allegations boil down to three things: that Mr. Betanabhatla induced Investor 1 to invest $1 million in a fund by falsely claiming that he had already *raised* $25 million from others; that he likewise falsely claimed that RCM had already *invested* that $25 million; and that he took $721,000 of the $1 million invested by Investor 1 and used it to invest in an oil and gas company owned by a *separate* fund that the Defendants controlled.

While, as noted, we cannot address here why Mr. Betanabhatla had a good faith basis for saying that he had *raised* $25 million, the Complaint's allegations as to the use of the word *invested* do not make out a fraud once one considers the entirety of the documents that the SEC excerpts but fails to address in full in the Complaint, to wit:

- The statement that $25 million had been *invested* by RCM—which was made in an email—was incorrect, but it was *corrected* by the two documents *that were part of that very email*. In fact, Mr. Betanabhatla explicitly directed Investor 1 to review those documents, writing: "Please find below summary bullet points on the [relevant investment opportunity]. I've also attached the full memorandum and financial model for your review."

3

- In other words, 1) the relevant statement in the email cannot be considered material because it was corrected in the same email, and 2) therefore, the email, taken as a whole, was not false.

- For the same reasons, the SEC's allegations are insufficient for a finding of scienter as to the use of the word "invested."

- Moreover, the Complaint implicitly acknowledges that any misimpression that the email might have created was fully corrected by Mr. Betanabhatla on a phone call with Investor 1, after the email but *prior to the investment being made*.

Similarly, the allegation that Mr. Betanabhatla misused Investor 1's funds by sending $721,000 to an oil and gas company controlled by another fund the Defendants managed (in which Investor 1 was also an investor) also does not state a claim for securities fraud. Specifically:

- The SEC cherry-picks certain language from the governing documents (and leaves out other, more relevant language) and relies on the wrong document altogether in its attempt to make out its allegations.

- The full text of the relevant document, the Limited Partnership Agreement ("LPA"), including the portions the SEC left out of its Complaint, reveals that Defendants' use of the funds was entirely proper.

Independently, the Complaint must be dismissed in its entirety because the SEC's actions here were not authorized in a manner consistent with Article II of the Constitution. The SEC is an executive agency enforcing federal securities laws and wielding executive power. The Constitution requires that executive power be wielded only by "officers" of the United States. Consistent with this requirement, the federal securities laws also require that SEC investigations be conducted by properly-appointed officers. The SEC Commissioners are all Principal Officers of

4

the United States, but their appointments are defective because they enjoy for-cause protection from removal by the President, meaning that their actions, including authorizing the proceedings in this case, are invalid. Separately, the SEC Staff who conducted the investigation that led to the filing of this case performed officer functions without proper appointments, and they too enjoy for-cause protections from removal by the President. All of *their* actions in the investigation that resulted in this lawsuit—and all of their resulting conclusions—are thus void. The instant, ensuing SEC enforcement action is therefore not proper as it was predicated on an investigative proceeding that is a legal nullity. In short, the SEC's investigation of the Defendants, from its inception through to the filing of this lawsuit against them, violates separation of powers principles and thus should be rejected as the legal nullity that it is, *ab initio*.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," nor do "'legal conclusion[s] couched as . . . factual allegation[s].'" *Id.*

Because each of the SEC's four claims against Defendants sound in fraud, they are subject to Federal Rule of Civil Procedure 9(b). *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). Rule 9(b) requires fraud to be alleged with "particularity"—*i.e.*, "the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Id.* Furthermore, in order for a statement to be fraudulent, it must be material, meaning that there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 747 (S.D. Tex. 2012).

## FACTUAL BACKGROUND

RCM is an investment adviser that Mr. Betanabhatla started in approximately 2016. ¶ 11.[2] RCM advises several private investment funds that Mr. Betanabhatla also formed and manages. ¶ 13. These funds include, relevantly, Ramas Energy Capital III, L.P. ("Ramas III") and Ramas Energy Capital IV, L.P. ("Ramas IV"). ¶ 13. Ramas III and Ramas IV were each established to invest primarily in oil and

---

[2] References in this Motion to Dismiss are made throughout to paragraph numbers from the Complaint. Defendants do not contest the factual allegations in the Complaint at this Motion to Dismiss stage but reserve the right to do so when and as appropriate. However, as set forth below, Defendants request that the Court read and consider certain documents referenced in the Complaint, "as well as documents attached to [this] motion, [as] they are referenced in the plaintiff's complaint and are central to the claims." *S.E.C. v. Jackson*, 908 F. Supp. 2d 834, 847 (S.D. Tex. 2012) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000)). *See* attached Exhibits 1-7.

gas companies operating in the Central Basin Platform of West Texas, with each fund investing primarily in one entity: for Ramas III, Pearl Mountain Exploration Holdings, LLC ("Pearl Mountain"), and for Ramas IV, Ruckus Energy Holdings, LLC ("Ruckus"). ¶ 14.[3] Mr. Betanabhatla formed Ramas IV on or about August 9, 2019, ¶ 17, and that same month executed an agreement with Ruckus requiring Ramas IV to invest $10 million in Ruckus by early September 2019, as well as an additional $15 million by late November 2019, for a total of $25 million. ¶ 19.

The Defendants approached Investor 1 in mid-October 2019 about investing in Ramas IV.  ¶ 25. About a month later, Mr. Betanabhatla had a telephonic meeting with Investor 1 about the Ramas IV investment opportunity. ¶ 26. In late December 2019, Investor 1 became a limited partner in Ramas IV by investing $1 million. ¶ 23. This case relates to the contents of communications between the Defendants and Investor 1 that induced him to make his $1 million investment as well as how $721,000 of that investment was applied by the Defendants. The Complaint *does not* allege that the Defendants pocketed Investor 1's investment.

---

[3] Pearl Mountain and Ruckus are referred to, throughout the Complaint, as the "Undisclosed Company" and the "Portfolio Company," respectively.

**ARGUMENT**

I.   **The Allegations in the Complaint Do Not Plausibly Allege That Defendants Committed Securities Fraud.**

A.   **Defendants' Statement to Investor 1 that They Had "Invested" $25 Million Was Immaterial and Cannot Have Been Fraudulent.**

To survive a motion to dismiss, the SEC's Complaint must allege that the purportedly fraudulent statements were material. Reading the allegations together with the relevant documents attached to and centrally referenced in the Complaint—as one must, *see Jackson*, 908 F. Supp. 2d at 847—it is clear that the statement that Defendants had invested $25 million into Ruckus was neither material nor misleading. The pleading is therefore fatally deficient as to those allegations, and the claims for fraud must be dismissed insofar as they rely on this statement.

The relevant allegations of the Complaint are contained in Paragraphs 25 and 26. Those paragraphs contain two separate allegations. *First*, in a bullet point ("Bullet Point 1") contained in an email, dated October 17, 2019 (the "October Email", attached as Ex. 1), the Defendants misrepresented to Investor 1 that they had "*invested* $25 million of a total $50 million equity commitment" in Ruckus[4] and, in another bullet point ("Bullet Point 2"), compounded that error by stating that "[e]quity invested to date has been used to fund Ruckus's development drilling

---

[4] Bullet Point 1 said, in relevant part: "Since closing, Ramas has *invested* $25 million of a total $50 million equity commitment." It should have said "Ramas has *raised*…."

program as well as Ruckus's acreage leasing program." ¶ 25 (emphasis added). *Second*, a month later, in a phone call on November 18, 2019, Mr. Betanabhatla orally misrepresented to Investor 1 that he had *raised* $25 million in Ruckus. ¶ 26.

1.  Taken as a whole, the October Email is not materially false or misleading.

There is no dispute here that the use of the word "invested" in Bullet Point 1 was erroneous. That notwithstanding, the October Email started with the words, "Please find below *summary bullet points* on the [relevant investment opportunity]. I've also attached the full memorandum [called Project Sierra Investment Committee Presentation, dated September 2019 (the "Investor Presentation" or "IP")] and *financial model for your review*." Ex. 1 at 1 (emphasis added). Ignoring these latter sentences, the SEC pulls out the word "invested" as if it were used in isolation—as if Mr. Betanabhatla did not include the attachments that corrected it and also did not specifically call those attachments to the attention of Investor 1.

But he did. Therefore, the relevant statement is not the use of the word "invested" in isolation; rather, the relevant statement is the entire email, with its body and attachments.[5] When one considers the *entire* email, one must conclude that 1)

---

[5] While it may seem self-evident, various courts have made clear that an attachment is generally considered to be part of an email proper. *See, e.g., Pratt Paper (LA), L.L.C. v. JLM Advanced Tech. Servs.*, No. CIV.A. 11-1556, 2013 WL 395815, at *4 (W.D. La. Jan. 31, 2013) ("in today's business environment, the use of e-mails, and more specifically email attachments, are commonplace during negotiations. . . . A sophisticated [party], who regularly uses email, was clearly on notice [of] certain

9

the statement as a whole was not false, *i.e.*, the use of the word "invested" did not stand alone, uncorrected, and 2) because Mr. Betanabhatla himself directed Investor 1 to the correct information, the Complaint fails to allege scienter adequately. It is self-evident that someone who affirmatively points a potential investor to documents that correct an inadvertent misstatement is not trying to mislead that investor by means of that same misstatement.

The financial model attached to the October Email was an Excel spreadsheet titled "Ramas Capital Management—Project Sierra Financial Model vFINAL_EXTERNAL6". ¶ 25. *See* Ex. 1 (spreadsheet excerpts attached as Exs. 2, 3). In a tab labeled "Monthly CFs"—*i.e.*, Monthly Cash Flows—Line 91 is labeled "Beginning Invested Equity Balance," and reflects how much of the initial $25 million capital contribution would be deployed by Ruckus each month beginning in November 2019.[6] *See* Ex. 2, line 91. For November 2019, the amount shown *was $0 and the relevant cell is highlighted in yellow*. *Id.* The same spreadsheet tab shows that total equity investment would not have reached $10 million until February 2020;

---

terms and conditions attached."); *Bermea v. United Servs. Auto. Ass'n*, No. CV SA-06-CA-0423-XR, 2006 WL 8435304, at *4 (W.D. Tex. July 7, 2006) (email and attachments gave Plaintiffs notice).

[6] This was one of the most important tabs in the model, as it projected when and how Ruckus was expected to become cash flow positive. It is, in other words, one of the first tabs any investor (and certainly someone qualified to purchase limited partnership interests) would look at in considering an investment.

would not have reached $20 million until June 2020; and would not have passed $25 million until August 2020. *Id.* This clearly shows Ramas IV had not in fact "invested" $25 million in Ruckus at the time of the October 17 email.

The second attachment to the October Email—the Investor Presentation—was dated September 2019. Ex. 4 at 1. It too spoke in future tense about acquisition of acreage and about drilling that was to take place over three months after the initial equity investment from Ramas IV. *Id.* at 9. Given these two documents, no reasonable person (much less a sophisticated investor) could have concluded that Ramas IV had *by mid-October* already invested $25 million "to fund Ruckus's development drilling program as well as Ruckus's acreage leasing program." ¶ 25.

Considering all this, it is also not reasonable to read Bullet Point 2—that "[e]quity invested to date has been used to fund Ruckus's development drilling program as well as Ruckus's acreage leasing program," ¶ 25—as referring to an investment made by Ramas IV. Indeed, a note in the same spreadsheet reflects that nearly $22.5 million of capital was in fact already committed to Ruckus by its current owners. In the very next tab after Monthly CFs—this one called "Base Case CFs and Returns"—cell N69 refers to the value of the capital contribution to Ruckus by its owners, as of November 1, 2019. Ex. 3. A note appended to the same cell N69 by Mr. Betanabhatla explains that Ruckus owners contributed "$11.8mm pre-money equity value + $10.4MM of cash contribution at closing." *Id.* The Investor

Presentation also speaks about capital contributions by Ruckus's current owners and describes an existing business which, as would be obvious to anyone, had to have used at least some invested equity capital for its development to date. Ex. 4 at 7.

To summarize, the relevant bullet points cannot be read in isolation. Investor 1 was provided with all of the necessary information to know the correct facts; he could not plausibly have been defrauded by a single out-of-context word. *See Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 651 (S.D. Tex. 2016) (a fact is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"). In any event, a proper reading of the October Email makes clear that there was no attempt to deceive or defraud Investor 1; Mr. Betanabhatla called his attention to the relevant, accurate facts and documents, which he would have reasonably expected Investor 1 to read and understand. *Id*.

>   2.   Mr. Betanabhatla corrected any misunderstanding in his pre-investment call with Investor 1.

Even if Investor 1 had been misled by the October Email, the Complaint still would be inadequate. The most plausible reading *of the Complaint itself* is that the November phone call *corrected* the October email.

The Complaint states in Paragraph 26 that: "On or about November 18, 2019, Mr. Betanabhatla spoke by telephone with Investor 1. Mr. Betanabhatla told Investor 1 that Fund IV had already *raised* $25 million for the fund. Mr. Betanabhatla further

told Investor 1 that his investment would be part of the last investment dollars raised to meet the $50 million equity commitment to the Portfolio Company." ¶ 25 (emphasis added). Accordingly, Mr. Betanabhatla did not, in the November conversation, repeat the error that he had *invested* $25 million; rather, he said that he had *raised* that much. The statement that one had "raised" a sum, following a statement that one had "invested" the same sum, logically can only be understood as correcting the initial statement.[7]

### B.  Defendants Were Authorized by the Deal Documents to Use Investor 1's Investment as They Did.

To support its allegation that the transfers to Pearl Mountain were unauthorized, the SEC selectively quotes from documents to give the impression that Defendants had absolutely no discretion in how they used Investor 1's money.[8]  In summary, the allegation is that Mr. Betanabhatla established Ramas IV exclusively

---

[7] Further, if Mr. Betanabhatla were trying to deceive Investor 1, he would have used the verb "to invest" on this call for the same reason the SEC views "invested" as important; it would have been more impressive and more likely to induce Investor 1 to invest. But even the SEC does not allege that Mr. Betanabhatla used the verb "to invest"; it says he used the word "*raised.*"

[8] The Complaint alleges that Mr. Betanabhatla caused Ramas IV "to transfer approximately $700,000 of the $1 million to Pearl Mountain (the company Ramas III had been formed to invest in primarily) even though it was not mentioned or disclosed anywhere in the offering materials. ¶¶ 37, 38. The Complaint further states that Mr. Betanabhatla "then used approximately $279,000 of the remaining balance" to pay legal costs, and subsequently "transferred the last $21,000 to [Pearl Mountain] as well." ¶ 39. The Complaint does not claim that the payment of legal expenses was a violation.

to invest in Ruckus, and could not use Investor 1's money for anything other than a direct investment into Ruckus, as though Ramas IV were a simple pass-through entity. Here again, the SEC's version of facts is belied by the language of the relevant documents.

The relevant documents that governed Defendants' use of Investor 1's invested funds clearly give the Defendants the legal authority to use those funds in the way that they did. A violation of securities law that sounds in fraud cannot logically be predicated on conduct that a defendant was authorized to undertake; scienter, after all, is defined as "a mental state embracing intent to deceive, manipulate, or defraud," *Aaron v. SEC,* 446 U.S. 680, 686 n.5 (1980). A mental state embracing the intent to act in accordance with an alleged victim's explicit contractual authorization is the diametric opposite of intent to defraud.

### 1.    The SPT is irrelevant—it is not one of the governing documents.

The Complaint alleges that Mr. Betanabhatla sent Investor 1 by email on November 22, 2019 (1) the Subscription Agreement for Ramas IV; (2) the LPA for Ramas IV; and (3) what the SEC misleadingly calls "the Offering Memorandum," but what is in reality a document summarizing the principal terms of the investment and is called, appropriately, the Summary of Principal Terms (the "SPT"). ¶ 21. The SEC aims to cabin Defendants' authority to act by alleging that the "Offering Memorandum" circumscribed that authority and limited it solely to purchasing

14

equity in Ruckus and nothing else. This is simply not so, as the full review of the relevant documents shows. To begin, the *LPA* is the governing document here; it is not the SPT, despite the SEC's effort to give it more prominence by calling it "the Offering Memorandum." The LPA (attached as Ex. 5) has a merger clause, which states:

> 12.4 <u>Entire Agreement</u>. Except as otherwise provided in Section 12.5,[9] this Agreement (including the Exhibits hereto) and the Subscription Agreement constitute the entire agreement and understanding of the General Partner and the Limited Partners pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of such Partners in connection herewith.

Ex. 5, § 12.4. By its terms this clause supersedes anything that may have been included or inferred from the SPT. The SPT (attached as Ex. 6) says so too *in the very first paragraph of its text*, clarifying that the Fund Documents,[10] and not it, govern the fund, to wit:

> The information contained herein is qualified in its entirety by the more detailed information contained in the Fund Documents. The Fund Documents should be read in their entirety by potential investors and their advisers prior to subscribing for an investment in the Fund.

Ex. 6 at 1. But lest there be any doubt that the SPT is the wrong document, the Subscription Booklet (attached as Ex. 7) states, in relevant part: "the Investor has

---

[9] Section 12.5, captioned "Limited Partner Side Agreements," is not relevant.

[10] The Fund Documents are: the LPA, the Subscription Booklet, and certain Portfolio Company Agreements. *See* SPT (Ex. 6), at 1.

relied solely on the Fund Documents … [and] has not relied on any information, representation or statement (written or oral) with respect to the Fund other than those expressly set forth in the Fund Documents [.]" Ex. 7 at 4. "Fund Documents," again, *excludes* the SPT itself. *See supra* at n.10.

> 2. <u>The LPA *is* the Relevant Document, and it grants the Defendants the authority to do what they did</u>

Paragraph 34 of the Complaint selectively quotes from Section 2.6 ("Purpose") of the LPA to make it sound as if it matches what the SPT says. It does not. Section 2.6 reads, in its entirety (with the portion the SEC omitted from the Complaint in bold):

> The Partnership has been organized for the object and purpose of conducting a line of equity investment in Ruckus Energy Holdings, LLC, a Delaware limited liability company (the "Portfolio Company"), and engaging in those activities necessary, incidental or ancillary thereto. **Notwithstanding the foregoing, the Partnership may engage in any other lawful act or activity for which limited partnerships may be organized under the Act in furtherance of the foregoing.**

LPA (Ex. 5), § 2.6 (emphasis added).

The SEC reads the provision that "[t]he Partnership has been organized for the object and purpose of conducting a line of equity investment in [Ruckus] and engaging in those activities necessary, incidental or ancillary thereto" to mean that the "object and purpose" of the Fund was to invest in Ruckus only (and nothing else) and that "activities necessary, incidental or ancillary thereto" do not include using a

portion of the money raised by the Fund to make an equity investment in Pearl Mountain on behalf of Ramas IV.[11] But this reading ignores the sentence that follows—one the SEC left out of its Complaint. The words "Notwithstanding the foregoing," must logically either expand or limit the breadth of the previous sentence—in other words, that phrase must be given its natural meaning. *See Iron Branch Assocs., LP v. Hartford Fire Ins. Co.*, 559 F. Supp. 3d 368, 378 (D. Del. 2021) (the court must "give effect to the plain meaning of the contract's terms and provisions," and "[i]n upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein") (applying Delaware law).[12] Here, the language of Section 2.6 makes clear that "Notwithstanding the foregoing" *expands* the reach of the previous sentence because it provides that the Partnership may engage in "any other" lawful acts: "the Partnership may engage in *any other* lawful act or activity . . . . ." Ex. 5. And the last clause of the second sentence ("in furtherance of the foregoing") cannot be read to limit this expansion of authority because doing so would effectively read the second

---

[11] We disagree that the language "necessary, incidental or ancillary thereto" is as limited in its coverage as the SEC claims, but we will assume, without conceding, that the SEC is correct as to its scope for purposes of this motion only.

[12] The LPA is governed by Delaware law. *See* LPA 12.6 ("This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the law of the State of Delaware without giving effect to principles of conflicts of laws.").

sentence out of the LPA. If, as the SEC seems to suggest, the second sentence did not expand the scope of the first, the LPA would have said: "In furtherance of the forgoing, the Partnership may engage in any lawful act or activity for which limited partnerships may be organized under the Act." That would be the most natural way to negate the impact of the words "notwithstanding the foregoing" and "any other". The only reading of the second sentence that does not do violence to its actual language is that, in addition to engaging in activities necessary, incidental, or ancillary to the object and purpose of the Partnership, the Partnership may also engage in *any other* activity in which Partnerships organized under the Act to engage in similar objects and purposes as this one may engage.

Consistent with this predicate, the LPA (Ex. 5), in Section 4.1 ("Authority and Obligations of General Partner"), grants the General Partner broad authority to go beyond the limited "object and purpose" that the SEC would have this Court believe was the sole function of the Partnership. Ex. 5, § 4.1.  Section 4.1(a) provides, in relevant part, that "the General Partner shall have the … power and authority to do all things necessary to effectuate the purposes, objects *and powers* of the Partnership." *Id.* (emphasis added). In addition, "[t]he General Partner has the power on behalf of and in the name of the Partnership to carry out any and all of the objects and purposes of the Partnership *and* to perform all acts which it may, *in its discretion*, deem necessary or *desirable*[.]" *Id.* (emphasis added). Section 4.1(a) then

18

enumerates no fewer than *twenty* broad categories of powers that the General Partner

has the discretion to exercise, including but not limited to, the powers to:

"(1) *direct the formation of investment policies and strategies* for the Partnership and *make all investment decisions with respect to the Partnership and its assets*;"

"(2) engage *in such investment activities as the General Partner may determine*, including to purchase … invest, and *otherwise conduct transactions, directly or indirectly, in and with respect* to Investments and *any other assets of the Partnership*;" and

"(20) do *such other* things and engage in *such other* activities as may be necessary, *convenient or advisable* with respect to the purpose, object *and conduct of the business of the Partnership*, and have *and exercise all of the powers and rights conferred upon limited partnerships formed pursuant to the Act*."[13]

*Id.*, § 4.1(a). Lastly, Section 4.1(c) of the LPA provides for the appointment of an

investment manager, and imbues that investment manager—Defendant RCM—with

"the full authority to acquire … any other assets for or on behalf of the Partnership

… and to make any other investment-related decisions with respect to the

Partnership." *Id.*, § 4.1(c).

Because Defendants were so authorized, with Investor 1's knowledge, their

conduct in using Investor 1's funds cannot be said to be fraudulent. *See, e.g.*,

---

[13] Reference is made here to certain relevant Section 4.1(a) subparagraphs, but Defendants respectfully submit that the Court review and consider the entirety of the LPA (Ex. 5), including, *inter alia*, all subparagraphs of Section 4.1(a). *See Jackson*, 908 F. Supp. 2d at 847 ("A district court can consider the contents of the pleadings, including attachments thereto, as well as documents attached to the motion, if they are referenced in the plaintiff's complaint and are central to the claims.").

*Dieckman v. Regency GP LP*, No. CV 11130-CB, 2021 WL 537325, at *36 (Del.

Ch. Feb. 15, 2021) (general partner cannot have engaged in fraud where conduct was

authorized by board of directors). The portion of the Complaint alleging violations

based on the application of Investor 1's funds must be dismissed.[14]

## II.   The Complaint Must Be Dismissed Because It Is Constitutionally Defective.

### A.   The Formal Order of Investigation Is Defective.[15]

In connection with their representation of the Defendants during the

investigation that resulted in the filing of this action, counsel for the Defendants

---

[14] The remaining allegation—that the Defendants misrepresented that an industry expert was involved in the deal—also cannot be sustained. The statement about the expert's involvement cannot be material for the simple reason that it cannot be viewed as materially changing the mix of information available to Investor 1. The SEC's theory here is that Ramas IV could do nothing aside from making a direct investment in Ruckus. According to fund documents, Ruckus was to be run by its management and a board of directors that did not include the industry expert. *See* Investor Presentation (Ex. 4) at 9; SPT (Ex. 6) at 3. On the SEC's own theory, therefore, industry expert's involvement in the fund could not have been material. If Investor 1 did not find the economic deal terms attractive, it defies common sense that he would have invested because of the industry expert's participation. The SEC appears to get that; and so it claims that a reasonable investor "would consider the fact that the fund was not being *offered and promoted* [*i.e.*, sold] by the persons represented important in deciding whether to invest in the offering." ¶ 47 (emphasis added). In other words, the SEC claims that this fact would have been important only because an investor would have liked to have known the true identity of the persons selling the deal. That is not a representation that goes to the core of the bargain at issue here; it is not material. *See, e.g.*, *SEC v. Mapp*, 240 F. Supp. 3d 569, 579 (E.D. Tex. 2017) (promoter's statements were mere puffery—not material or fraudulent).

[15] The factual background of the SEC's Investigation is relevant to the Defendants' pursuit of their challenge to the constitutionality of the SEC's enforcement scheme and the removal protections enjoyed by the SEC's officers, as it was in *Cochran v.*

asked SEC Staff to provide them with what is colloquially called the Formal Order of Investigation – the document by which the SEC initiates its formal investigations (an "FO"). SEC Staff provided a document titled Order Directing Private Investigation and Designating Officers to Take Testimony, dated October 5, 2021 (the "Original FO", attached as Ex. 8). The Original FO, captioned *In the Matter of Ramas Capital Management, LLC*, LA-5255, directed, "pursuant to the provisions of Section 20(a) of the Securities Act, Section 21(a) of the Exchange Act, and Section 209(a) of the Advisers Act, that a private investigation be made," and further directed, pursuant to Section 19(c) of the Securities Act, Section 21(b) of the Exchange Act, and Section 209(b) of the Investment Advisers Act, that:

> for purposes of such investigation, [certain identified members of SEC Staff], and each of them, are **hereby designated as officers of the Commission and are empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production** of any books, papers, correspondence, memoranda, contracts, agreements, or other records deemed relevant or material to the inquiry, **and to perform all other duties in connection therewith as prescribed by law.**

Ex. 8 at 3 (emphasis added). The Original FO provided to the Defendants was signed by Jill Peterson, Assistant Secretary of the SEC, who appears to have signed for Vanessa Countryman, SEC Secretary, whose name appears on the Original FO. *Id.*

---

*U.S. Sec. & Exch. Comm'n*, 20 F.4th 194, 201 (5th Cir. 2021), *cert. granted sub nom. Sec. & Exch. Comm'n v. Cochran*, 212 L. Ed. 2d 777, 142 S. Ct. 2707 (2022).

The Original FO asserted that it was issued "for the Commission, by the Division of Enforcement, pursuant to delegated authority" under 17 C.F.R. § 200.30-4(a)(13). *Id.* at 3, n.1. Despite that assertion, the Original FO was blank above the signature block that identified Ms. C. Dabney O'Riordan, Co-Chief, Asset Management Unit as the person approving it.[16] *Id.* at 3. The "Date Approved" line was also blank. *Id.* Because the Original FO was unsigned and undated by anyone from the Division of Enforcement, counsel for the Defendants asked for a signed copy (if one existed) and for confirmation that indeed it was signed on or about the date of the Original FO, October 5, 2021. This was in the context of counsel questioning SEC Staff about whether the Staff conducting the investigation were properly appointed in conformity with constitutional requirements.

In response, in April of 2022, the Staff provided another version of the Formal Order (the "Revised FO", attached as Ex. 9). The Revised FO contained Ms. O'Riordan's signature above her name, and the "Date Approved" line was now filled in; it said "October 5, 2021." Ex. 9 at 3 Missing from the Revised FO were the name, stamp and signature of Jill M. Peterson, the Assistant Secretary of the SEC, or any signature reflecting approval by the Office of the Secretary. *Id.* This suggests, of course, that the Original FO was not signed by anyone from the Enforcement

---

[16] She would have been approving her own designation thereby. *See* Original FO (Ex. 8) at 3.

Division on or about October 5, 2021, which means that no properly signed FO was in existence until the creation of the Revised FO. It also suggests that the SEC's Secretary did not issue the Revised FO properly. But the Revised FO had something else the Original FO did not have: it bore a stamp endorsement stating "Ratified by Gurbir Grewal, Director, Division of Enforcement, Securities and Exchange Commission, March 15, 2022." *Id.* This stamp by the Director of the Division of Enforcement is an implicit admission that the Original FO was defective (or ineffective), meaning that the investigation was not properly initiated on October 5, 2021; that the relevant investigative Staff were not properly appointed or designated; and that the Original FO failed to "empower" them to exercise officer functions.

### B.     Because the Commission Enjoys For-Cause Protections from Removal by the President, It Cannot Prosecute this Case.

Under Article II of the Constitution, the entirety of the Executive Power is "vested in [the] President." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020). The President's executive power includes "appointing, overseeing, and controlling" officers of the United States who wield that power, which, "in turn, generally includes the ability to remove" such officers on an "unrestricted" basis, as "has long been confirmed by history and precedent." *Id.* at 2197–98. If the coercive power of the Executive is devolved to an executive agency or department, the head of that agency or department must be removable at will for the structure to be constitutional. *Id.* (invalidating actions of head of CFPB because of restrictions on removal).

The Commission is the head of an executive agency (*see Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 511–13 (2010)) that wields executive power. *See Seila Law*, 140 S. Ct. at 2200 (authority to seek daunting monetary penalties against private parties on behalf of the United States is a quintessential executive power). The Commission must therefore be removable by the President at will. *Id.* In *Free Enterprise*, however, the government acknowledged that the Commission is not so removable. *See Free Enterprise*, 561 U.S. at 487. Rather, SEC Commissioners cannot be removed except for "inefficiency, neglect of duty, or malfeasance in office." *Id*. The manner of the delegation of the executive power to the SEC, through the Commission as its head, therefore, is unconstitutional as it was with respect to the head of the CFPB in *Seila Law*.

Three things follow. *One*, the Complaint in this case was filed by an agency that was not under proper presidential control in violation of the Constitution. The filing of the Complaint is therefore not properly authorized, and it must be dismissed. *See generally Seila Law*, 140 S. Ct. 2183 (a civil investigative demand issued by an officer not removable at will by the President cannot be enforced). *Two*, until any impediments to the President's removal power of all the Commissioners are removed, the SEC cannot continue to prosecute this action. *Id.*; *see also Free Enterprise*, 561 U.S. at 513 (parties facing government enforcement efforts are entitled to "relief sufficient to ensure that [the enforcement efforts] to which they are

subject will be enforced by a constitutional agency accountable to the Executive"); *see also id.* ("a separation-of-powers violation may create a 'here-and-now' injury that can be remedied by a court") (quoting *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986). *Three*, any appointments made by an improperly constituted Commission are also invalid, including any officer appointments. The Complaint must be dismissed for these reasons alone.

### C. The SEC Staff Investigating and Prosecuting this Case Perform Officer Functions Without Proper Appointments.

The power of inferior officers to enforce federal law on behalf of the United States is derived from the President's executive power. *Seila Law*, 140 S. Ct. at 2197. Enforcement Staff wield that executive power and discharge officer functions when they initiate and conduct investigations, as well as when they prosecute enforcement actions like this one. *See Free Enterprise*, 561 U.S. at 485-86. It follows that this power can only be wielded by "officers" who hold proper appointments. *Seila Law*, 140 S. Ct. at 2197.

Reflecting this reality, Congress was sure to require in the relevant enabling provisions of the federal securities laws that those laws be enforced exclusively by "officers." The authorizing statutory provisions under which the FO was issued and under which the investigation of Defendants was conducted—Section 19(c) of the Securities Act, Section 21(b) of the Exchange Act, and Section 209(b) of the Investment Advisers Act—require investigations to be conducted either by one of

the Commissioners or by an inferior officer designated by the Commission for that purpose. *See* 15 U.S.C. § 77s(c) ("For the purpose of any such investigation, or any other proceeding under this chapter, any member of the Commission or **any officer designated** by it is empowered . . . .") (emphasis added); 15 U.S.C. § 78u(b) (substantively same); 15 U.S.C. § 80b-9(b) (substantively same).[17]

Note that the grouping of the Commissioners with other officers in the authorizing language implies a parity of authority; the use of the term officer, in other words, reflects congressional intent (and appreciation) that those conducting SEC investigations were imbued with "significant authority pursuant to the laws of the United States." *Free Enterprise*, 561 U.S. at 486 (quoting *Buckley v. Valeo*, 424 U.S. 1, 25–26 (1976)). Note too that by empowering inferior officers to seek evidence "**which the Commission deems relevant** or material to the inquiry," 15 U.S.C. § 78u(b) (emphasis added); 15 U.S.C. § 80b-9(b) (substantively same), the authorizing provisions delegate to designated officers a portion of the Commission's power as well as its discretion.

---

[17] One may view the statutory requirement that only officers conduct SEC investigations as the establishment of an office by Congress for the purpose of conducting investigations, *i.e.*, Congress authorized the SEC to appoint officers, *see* 15 U.S.C. §78d(b)(1) ("The Commission shall appoint and compensate officers, attorneys, economists, examiners, and other employees in accordance with section 4802 of title 5."), and in specifying that only officers were to conduct investigations, Congress effectively mandated that a subset of SEC employees be created who could conduct such investigations.

The SEC Enforcement Manual explains a Formal Order's purpose, in part:

[I]t designates specific staff members to act as officers for the purposes of the investigation and empowers them to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of documents and other materials. Formal *investigative proceedings* are nonpublic unless otherwise ordered by the Commission.

SEC Enforcement Manual, Section 2.3.4 (emphasis added). [18] A Formal Order is, by the SEC's own admission, the instrument by which the SEC empowers its Staff to perform officer functions on its behalf and conduct a proceeding. After reciting the relevant authorizing statutory provisions, the FO here states that: "[the listed individuals] are hereby designated *as officers* of the Commission and *are empowered to* administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of … records deemed relevant or material to the inquiry, *and to perform all other duties in connection therewith as prescribed by law*." Ex. 8 at 3 (emphasis added).

This means that either the listed staffers must be individuals who have already been appointed as officers tasked with conducting a specific investigation (a reading most consonant with the plain language of the authorizing provisions' use of the word "designated"); or that the FO is the instrument by which staffers are appointed as officers so that they can exercise the power (and discretion) of the executive; or—

---

[18] Available at https://www.sec.gov/divisions/enforce/enforcementmanual.pdf.

in the words of the Enforcement Manual—*act as officers*. In either case, the apparent purpose of the FO is to authorize Staff to perform officer functions in connection with a proceeding. Indeed, if what the Staff do in conducting investigations is not exercising executive power, they have no need to have some portion of that power delegated to them.

The problem here is that both of the FOs—the October 5, 2021 Original FO, and the apparently backdated April 2022 Revised FO—are defective, and, as a result, the SEC Staff were (and are) exercising power they do not lawfully possess because they were not properly appointed. *See Collins v. Yellen*, 141 S. Ct. 1761, 1788 (2021). Inferior officers may be appointed only by the President, Courts of Law, or Heads of Departments. U.S. CONST., art. 2, § 2, clause 2. Here, Commission personnel carrying out "officer" responsibilities had to be properly appointed as officers by the Commission reporting to the President. *See*, *e.g.*, *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018). But the Commission did not appoint them, and neither Ms. O'Riordan, nor the Director of Enforcement, nor the Assistant Secretary has the power to appoint inferior officers.[19] The FO's purported appointment is, therefore, a

---

[19] And we are not even sure that any of *them* held a proper appointment, although Ms. O'Riordan's designation of herself suggests that she was not.

nullity.[20] All actions by officers who are not properly appointed are void. *Id*.[21] These actions subjected the defendants to an unlawful, unconstitutional proceeding and obtained information from various sources, including the Defendants, by misrepresenting the scope of their authority.[22] That proceeding and all that follows from it are void. *See Lucia*, 138 S. Ct. at 2055 (party who makes timely Appointments Clause challenge is "entitled to relief," including re-do of proceeding before properly appointed officer). As the product of a process that is void, the Complaint must be dismissed.

---

[20] For the same reasons, the purported ratification by the Director of the Division of Enforcement (who is not a head of a department) of the appointment of Staff in the Original FO is also a legal nullity. Even if the Original FO was a designation of officers—and even assuming the Director had the power to designate existing officers—one would have to be properly appointed before being so designated. The Director's attempt to ratify the Original FO after the fact means that none of them was properly appointed.

[21] As mentioned, it is not clear that the Original FO was properly issued and signed by anyone at the Division of Enforcement on the date purportedly authorized, October 5, 2021. If so, putting aside any other defects, the Original FO was ineffective because the relevant formal requirements were not met. The resulting investigation was not authorized; all actions pursuant to it were *ultra vires*. Similarly with the Revised FO, which does not appear to have been signed/approved by the Office of the Secretary: it is also signed by someone other than the Director of Enforcement, in contravention of the delegation language in the Enforcement Manual. In sum, there does not appear to be an effective formal order in this matter.

[22] For example, at the beginning of Mr. Betanabhatla's on-the-record testimony (in which he was unrepresented by counsel), the Staff conducting it showed him the Original FO as the source of their authority to conduct the investigation and, specifically, that testimony session.

29

**D.     Because the SEC Staff Enjoy For-Cause Protections from Removal by the President, They Cannot Prosecute this Case.**

Even if the relevant SEC Staff were properly appointed, the second independent reason that the investigation that led to the filing of this case was improper (as is the prosecution of the case in this Court) is that, like the Commissioners themselves, regular SEC Staff cannot be removed at will.[23] Therefore, all of the consequences that flow from that defect apply here. Indeed, the problem is even worse because the SEC Staff enjoy two layers of for-cause protection from the President. As the Supreme Court ruled more than ten years ago, in order to maintain proper oversight by the President, ensure political accountability, and avoid diffusion of executive power, inferior officers who exercise the executive function cannot be separated from the President by multiple layers of for-cause protection from removal. *See Free Enterprise*, 561 U.S. at 483.

## CONCLUSION

For the reasons set forth herein, Defendants respectfully submit that this Court should dismiss 1) the entire Complaint against them on constitutional grounds as well as 2) the fraud claims to the extent set forth above.

---

[23] 5 U.S.C. § 4802 (*see supra* note 17) requires the SEC to comply with the merit system principles, which provide various protections against removal at will to *all* its employees, including the Director of Enforcement. *See* 5 U.S.C. §§ 2301–02.

Dated: December 16, 2022

Respectfully submitted,

**LIPMAN LAW PLLC**

*/s/ Alex Lipman*

Alex Lipman (admitted *pro hac vice*)
147 West 25th Street, 12th Floor
New York, New York 10001
Phone: (212) 401-0070
alexlipman@lipmanpllc.com

**SMYSER KAPLAN & VESELKA, L.L.P.**

David Isaak
State Bar No. 24012887
S.D. ID No. 26694
Hector R. Chavez
State Bar No. 24078335
S.D. ID No. 1364992
717 Texas Avenue, Suite 2800
Houston, Texas 77002
Phone: (713) 221-2300
Fax: (713) 221-2320
disaak@skv.com
hchavez@skv.com

**LAW OFFICE OF DANIEL F. WACHTELL**

Daniel F. Wachtell *(of counsel, pro hac vice forthcoming)*
90 Broad Street, 23rd Floor
New York, New York 10004
Phone: (917) 667-6954
dan@danwachtell.com

**ATTORNEYS FOR DEFENDANTS RAMAS CAPITAL MANAGEMENT, LLC AND GANESH H. BETANABHATLA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2022 copies of this document are being served all counsel of record via the Court's ECF/CM system.

*/s/ Hector R. Chavez*
Hector R. Chavez