# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        *Plaintiff*,<br><br>  v.<br><br>RAMAS CAPITAL MANAGEMENT, LLC and GANESH H. BETANABHATLA,<br><br>        *Defendants*. | CASE NO. 4:22-cv-2979 |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

**LIPMAN LAW PLLC**
Alex Lipman (admitted *pro hac vice*)
147 West 25th Street, 12th Floor
New York, New York 10001

**SMYSER KAPLAN & VESELKA, L.L.P.**
Hector R. Chavez
David Isaak
717 Texas Avenue, Suite 2800
Houston, Texas 77002

**LAW OFFICE OF DANIEL F. WACHTELL**
Daniel F. Wachtell *(of counsel, pro hac vice forthcoming)*
90 Broad Street, 23rd Floor
New York, New York 10004

**ATTORNEYS FOR DEFENDANTS RAMAS CAPITAL MANAGEMENT, LLC AND GANESH H. BETANABHATLA**

## INTRODUCTION

As discussed in Defendants' initial brief, the full context provided by the documents referenced and discussed in the Complaint makes clear that 1) the Defendants did not—and did not intend to—falsely represent to Investor 1 that they "invested" in Ruckus, and 2) that the Defendants did not misuse the funds invested by Investor 1 because they acted in conformity with the relevant deal documents.

The SEC's opposition ("Opp'n") cannot rebut meaningfully the Defendants' argument that the use of the word "invested" in an October email to Investor 1 was not materially false or misleading because it was corrected by the attachments included with (and part of) that email. The best the SEC can do is claim that the relevant attachment (the project financial model) was too big and complex to correct effectively the mistaken use of the word "invested" in the October email. This is a red herring. The model was indeed voluminous, but the SEC does not dispute that the key tabs—Exs. 2 and 3—are the two most important slides in the model, and that, as a sophisticated investor, Investor 1 would be expected to read and understand those two clearly-labeled, key output tabs. This is especially true given that Mr. Betanabhatla drew Investor 1's attention to the model in the October email. The SEC also effectively concedes that Mr. Betanabhatla did not repeat the use of the word "invested" on his call with Investor 1. The relevant allegations, when put in context, support an inference of good faith conduct, not intent to defraud anyone.

The SEC offers nothing of substance to counter the argument that the relevant contractual language gave the Defendants the authority to use Investor 1's money as they did. Its response dismisses (without any analysis) the relevant contractual language as "boilerplate" and a "state-law savings clause," as if "boilerplate" and "savings clause" have no meaning or legal consequences. In effect, the SEC admits *sub silentio* that the Defendants' reading of the relevant contractual language is correct. Using investor funds in a manner consistent with the governing documents is also consistent with acting in good faith.

The SEC is also unable to rebut the Defendants' constitutional arguments. It concedes that the Commission is insulated from presidential control by for-cause removal protections, but it fails to engage on what that means.  The SEC argues, for example, that the SEC can ratify Staff actions despite this infirmity. It cannot: a commission whose members are not removable at will cannot enforce an investigative subpoena or engage in other enforcement actions. It cannot ratify Staff actions because it cannot ratify something it is (and was) unable to do itself. The Director of Enforcement's purported ratification is also ineffective. He is unable to ratify officer appointments. As for his (and the Commission's) purported ratification of Staff's conduct during the investigation, the SEC opposition is utterly devoid of any detail about whether the Director or the Commission were even aware of what the Staff did, let alone ratified their conduct.

The SEC is also unable to defeat the argument that SEC Staff perform officer functions requiring appointments. It offers no answer to the Defendants' textual analysis of the relevant securities laws, aside from conclusory assertions. And its observation that SEC Staff are not like SEC ALJs is meaningless; both wield executive power, albeit by performing different functions.  What the SEC says instead is that when the SEC Staff compel obedience by telling people they investigate that they are *officers* of the Commission, they do not mean the word officer to be synonymous with "officer of the United States." That makes no sense. There is no separate font of power that the SEC can inherently draw on: all executive power in our constitutional system is vested in one person, the President; when an official of an executive agency wields power, he or she wields executive power.

## ARGUMENT ON REPLY

**A.    Defendants' Statement to Investor 1 that They Had "Invested" $25 Million Was Immaterial and Cannot Have Been Fraudulent.**

Defendants' Motion to Dismiss demonstrates that the SEC's fraud claim cannot be predicated on the use of the word "invested" in an October 2019 email from the Defendants to Investor 1 because the entire email included attachments that negated the suggestion that RCM already invested any money as of the date of that email. In addition, the October email contradicts any suggestion that Mr. Betanabhatla was attempting to mislead Investor 1 into believing that he had already invested other investors' funds in Ruckus because he specifically called

Investor 1's attention to the attachments containing correct information. For these reasons, the use of the word "invested" was not material, the email, taken as a whole, was not false or misleading, and the email cannot serve as a predicate for a finding of scienter in relevant respects. Br. at 8–13.

Conceding that the court "may consider documents attached to a motion to dismiss" when, as here, "they are referred to in the complaint and are central to the plaintiff's case" (see Opp'n at 8 n.4), the SEC claims that the Defendants cherry-picked certain tabs and misinterpreted them. Opp'n at 9. It is not cherry-picking to select the two most critical tabs for the court's consideration. The SEC does not dispute that Ex. 2 is one of the most important tabs in the model; a tab Investor 1 would want to examine and understand before investing. *See* Br. at 10 n.6. The SEC also does not dispute that Ex. 2 shows that as of November 2019 the Beginning Invested Equity Balance was zero and that total invested equity would not cross the $25 million mark until August of 2020. *See* Br. at 10-11.[1]

Given these obvious, uncontestable contents of the documents central to the Complaint, the SEC claims that it is implausible that "an investor could have determined the email was false by studying a detailed, 25-tab financial spreadsheet

---

[1] The SEC's assertion that Ex.3 includes a note from Mr. Betanabhatla attributing at least $10.4 million to investment from a Ramas fund has no basis in fact. Opp'n at 9. There is no such note. The SEC has the relevant schedule and should know by now that the relevant cell from Ex. 3 links to the cell in Ex. 2 that shows that Ramas has contributed zero equity dollars as of November 1, 2019.

to uncover the truth" Opp'n at 9. As is true of all models, most of the tabs in the model consist of spreadsheets reflecting inputs, *i.e.*, assumptions and calculations. Those inputs are then summarized in (and linked to) the most critical tabs, such as Exs. 2 and 3. The SEC does not dispute that Investor 1 was a very sophisticated investor. It is implausible to think that he would not have reviewed and analyzed the financial model provided to him—and especially the portion of the model that dealt with when the investment would become cash-flow positive. It is also implausible to think that if Investor 1 could not personally understand the model—which he did—he would not have engaged a consultant to explain it to him.

Finally, the Defendants never claimed that the Complaint explicitly alleged that the misstatement about having invested funds was corrected on a subsequent phone call. Rather, the Defendants argued that Mr. Betanabhatla's use of the verb "to raise" in his call with Investor 1 *effectively corrected* any misimpression left by the October email because, as a matter of simple logic, one would not have used the word "raised" if, by the time of the relevant conversation, one had already "invested." Br. at 12-13. In addition, the use of the word "raised" in the call with Investor 1 negates scienter: if Mr. Betanabhatla were trying to deceive Investor 1 into believing that Ramas IV had already both "raised" and "invested" $25 million, he would have repeated the verb "to invest" on that call. The SEC's recitation of the relevant Complaint allegations in its opposition supports this analysis because it

confirms that Mr. Betanabhatla used the word "raised" and did not mention the word "invested." *See* Opp'n at 7-8.

In sum, it is not plausible that Investor 1 was defrauded by a single out-of-context word, and the Commission should not be allowed to skew the facts through omissions in their pleadings to suggest the opposite. *See Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 652 (S.D. Tex. 2016) (a fact is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"). For these reasons, it is also not plausible that Mr. Betanabhatla acted with scienter.[2]

---

[2] Further, as noted in our initial brief, the SEC has to pretend that Mr. Betanabhatla had not been conned to save its fraud Complaint, lest it face the fact that it was entirely reasonable for Mr. Betanabhatla to have believed that he had in fact raised $25 million when he told Investor 1 that he did so. *See* Opp'n at 16 (arguing that Mr. Betanabhatla acted with scienter because "he knew he had *not raised* any money for the fund.") (emphasis in original).

The SEC claims that it does not "know" that Mr. Betanabhatla was a victim of a con. Opp'n at 16 n 10. If the SEC is looking for metaphysical certitude, we will concede that it does not "know." In any other sense, the SEC is aware and decided to omit the con-related facts in its Complaint. Counsel for the defendants had made the description of the con one of the central aspects of the Wells submission to the SEC on their behalf. Counsel supported the submission with quotations and citations to contemporaneous documents, including relevant texts and emails. Counsel offered to provide all the relevant supporting documents to the SEC Staff conducting the investigation. The investigative SEC Staff decided that it did not want to see those documents. The SEC will see them for the first time in discovery in this case.

Significantly, Mr. Betanabhatla's belief that he had raised $25 million from the con-woman provides context for how the $1 million invested by Investor 1 was used. Because the entire $25 million expected from her would not have been needed until August of 2020, it made business sense to the Defendants to use their authority under the documents to apply the $1 million from Investor 1 as they did.

**B.    Defendants Were Authorized by the Deal Documents to Use Investor 1's Investment as They Did.**

Defendants provided a seven-page, thorough, specific textual analysis of the relevant transaction documents to demonstrate that the SEC's allegations about misuse of investor funds were predicated on selective and incomplete quotations of the relevant agreements. *See* Br. at 13-20. The upshot of that analysis is that the relevant governing language of the LPA gave the Defendants specific authority to invest the funds they received from Investor 1 as they did. Put differently, the language of the LPA expands the scope of permitted uses of Ramas IV investor funds, and one cannot defraud another by using funds in a manner consistent with specific authorization. Put yet another way, the corollary of the SEC's assertion that it is fraud to use investor funds for an unauthorized purpose is that when the use of funds is specifically authorized, there is no fraud and no fraudulent intent.

In its opposition, the SEC appears unable to refute that textual analysis on its merits, effectively conceding the Defendants' reading of the relevant language. Instead, the SEC does two things: 1) makes a conclusory assertion that the LPA merely authorizes lawful acts limited to making an equity investment in Ruckus; and 2) bootstraps that bold assertion by dismissing the relevant language of the LPA as "boilerplate state-law savings clause." Opp'n at 12-13. There is no meaningful way to address conclusory assertions; Defendants respectfully refer the court to pages 13 through 20 of the Motion that remain unanswered. But the assertion that the relevant

language is "boilerplate state-law savings clause" is meaningless for additional reasons. If a savings clause is meant to make clear that one's authority expands to the limits of state law—and if that is what the SEC means by "state-law savings clause"—the clause must be read carefully and one must give effect to every word. Further, boilerplate or not, words in contracts have meaning and must be given effect. *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2209 ("But boilerplate is boilerplate for a reason—because it offers tried-and-true language to ensure a precise and predictable result."). In short, the broad grant of authority set forth in the LPA is not mere boilerplate, but even if it were, it has meaning, and the SEC cannot summarily render it meaningless.[3]

## C. The Complaint Must Be Dismissed Because It Is Constitutionally Defective.

In their motion, the Defendants argued that because the SEC Commissioners enjoy for-cause removal protections, three things follow: 1) the filing of the Complaint was not properly authorized, 2) the Commission cannot continue to prosecute this matter until the removal protections are eliminated, and 3) any appointments made by an improperly constituted SEC, including that of the

---

[3] The SEC's characterization of the Defendants' position concerning the industry expert portion of the SEC Complaint is incorrect. As set forth in Defendants' brief, if one were to accept the SEC's allegations as true—"[o]n the SEC's own theory" that the sole purpose of Ramas IV was to hand money raised from Investor 1 to Ruckus and nothing else—it would matter none at all that the industry expert was involved in selling the deal. *See* Br. at 20 n.14.

Enforcement Director, are invalid. Br. at 24-25. The SEC appears to concede that its

Commissioners cannot be removed by the President except for inefficiency, neglect

of duty, or malfeasance in office. *See* Opp'n at 27. Nevertheless, the SEC argues that

its actions are valid and enforceable because 1) the SEC is not covered by the

Supreme Court's circumscription of *Humphrey's Executor v. United States*, 295 U.S.

602, 612 (1935) in *Seila Law*, 140 S. Ct. at 2192, and 2) because the removal defect

does not render Commission action void. We address these arguments in order.

      1.    <u>The SEC Is Improperly Constituted Because Its Commissioners<br>Are Insulated From Presidential Control.</u>

In *Seila Law*, the Supreme Court held that the head of an executive agency

(CFPB) wielding executive power may not enjoy protections from removal by the

President, and, as a result, the Court refused to enforce an investigative subpoena

issued by this executive. *Seila Law*, 140 S. Ct. at 2192. To arrive at this conclusion,

the Supreme Court reviewed the scope and reach of *Humphreys' Executor* because,

in 1935, *Humphrey's Executor* upheld a statute that protected the commissioners of

the FTC from removal except for inefficiency, neglect of duty, or malfeasance in

office. *Seila Law*, 140 S. Ct. at 2198. The *Seila Law* Court distinguished *Humphrey's

Executor*, observing that *Humphrey's Executor* was decided on the (apparently

erroneous) understanding that the FTC (as it existed in 1935) exercised "no part of

the executive power." *Seila Law*, 140 S. Ct. at 2198, 2200 n.4 (quoting *Humphrey's

Executor*, 295 U.S. at 628). Instead, the *Humphrey's Executor* Court understood the

FTC to be an administrative body that acted as a legislative agency and as an agency of the judiciary. *Humphrey's Executor*, 295 U.S. at 628. To the extent the FTC exercised any "executive function," as opposed to wielding executive power, "it did so only in the discharge of its quasi-legislative or quasi-judicial powers." *Id.*

The SEC argues erroneously here that because *Humphrey's Executor* has not been explicitly overruled, it supports the notion that a multi-member Commission whose members enjoy removal protections is constitutional. Opp'n 27-8. The logic of *Humphrey's Executor* as discussed in *Seila Law* suggests otherwise. The SEC wields quintessential executive power, as the SEC itself admits in its opposition. Opp'n 18-19, 23-24. Its members must be removable by the President in order to comply with constitutional requirements. *Cf. Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484 (2010) (members of a multi-member board wielding executive powers may not enjoy multiple layers of protection from removal by the President). Moreover, *Humphrey's Executor* has not been overruled because its reach has been limited to be consistent with the Court's reasoning in *Seila Law* and other recent appointments cases. The only remaining real difference between *Seila Law* and what is left of *Humphrey's Executor* is that the former dealt with a single individual agency head, while the latter upheld the constitutionality of a muti-member commission. But, as Justice Kagan pointed out in her partial dissent in *Seila Law*, the constitutional issues related to insulation from presidential control

are even more acute in multi-member commissions. *See Seila Law*, 140 S. Ct. at 2225 (Kagan, J., dissenting in part and concurring in part).

>    2.   Continuation of This Matter Is a Constitutional Injury That the Court Must Stop.

The Defendants never claimed that the actions of the Commission itself were void *ab initio*. That would be true if the Commissioners had not been properly appointed. Here, in contrast, the remedy is different: according to *Seila Law* a subpoena issued by a properly-appointed officer who enjoys removal protections cannot be enforced. *Seila Law*, 140 S. Ct. 2183. Specifically, the *Seila Law* Court remanded on the issue of whether the head of an agency who is properly appointed and does not enjoy removal protection can ratify a subpoena issued by a predecessor who did enjoy such protections, but the Court refused to enforce the subpoena. *Seila Law*, 140 S. Ct. at 2211. What follows is that unless validly ratified—assuming that ratification is possible—the actions of the SEC here cannot be given effect, meaning that 1) the Complaint is improper, 2) the Commission cannot continue to prosecute this matter, and 3) Enforcement Staff appointments, including that of the Enforcement Director, are invalid.

The SEC relies on *Collins v. Yellen*, 141 S. Ct. 1761 (2021) and *Community Financial Services Ass'n of America, Ltd. v. CFPB*, 51 F. 4th 616 (5th Cir. 2022) for the proposition that Defendants must show that the President wanted to remove the Commission, was unable to do so, and that there was a connection between the

President's inability to remove the Commission and the filing of this enforcement action. *See* Opp'n at 28-29. This assertion proves too much. Neither *Collins* nor *Community Financial* relates to a law enforcement function; *Collins* was a challenge to a contractual arrangement involving the Department of the Treasury and the Federal Housing Finance Agency, *Collins*, 141 S. Ct. at 1170, and *Community Financial* was a challenge to a rule promulgated by the CFPB, *Community Financial*, 51 F. 4th at 623. In each case, one question before the court was whether insulation from presidential control resulted in a redressable injury. *See Collins*, 141 S. Ct. at 1788-89; *Community Financial*, 51 F. 4th at 631-32. That inquiry is not necessary in a law enforcement case such as this one because "[a]s the Court recogniz[ed in *Seila Law*], enforcement of a civil investigative demand by an official with unconstitutional removal protections injures Seila." *Seila Law*, 140 S. Ct. at 2220 (Thomas, J., concurring in part and dissenting in part) (citing majority opinion at *Seila Law*, 140 S. Ct. at 2195-96). In an enforcement case, the injury is assumed because the subject of the enforcement action continues to be forced to defend and respond. *See Seila Law*, 140 S. Ct. at 2196 ("Petitioner is compelled to comply with the civil investigative demand and to provide documents it would prefer to withhold, a concrete injury."). *See also Consumer Fin. Prot. Bureau v. Seila Law LLC*, 997 F.3d 837, 843 (9th Cir. 2021) (Bumatay, J., dissenting) ("In the criminal context, for example, the Court usually regards structural violations as 'so intrinsically harmful

as to require automatic reversal' of the defective decision.") (citing *Neder v. United States*, 527 U.S. 1, 7 (1999)). Indeed, this injury is continuing so long as the unconstitutionally insulated Commission continues its enforcement efforts. *Seila Law*, 140 S. Ct. at 2221 (Thomas, J., concurring in part and dissenting in part). *See also Free Enterprise*, 561 U.S. 513 (petitioners "are entitled to declaratory relief sufficient to ensure that the reporting requirements and auditing standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive," noting that a "separation-of-powers violation may create a 'here-and-now' injury that can be remedied by a court") (citation omitted).

In sum, continuing to be subjected to an enforcement action by a Commission whose members are insulated from presidential control is a constitutional injury that this court must remedy by dismissing this action.[4]

---

[4] The SEC's assertion that Defendants should have raised these issues sooner can be given no credit. In fact, it is galling. To begin, the Defendants did not challenge any subpoenas, but they were never under a subpoena. They were also unrepresented when most of the relevant investigative steps were taken; and did not engage counsel until after they were told by the Staff that it had reached its conclusions. During the investigation, the Staff *represented themselves* to the Defendants as properly appointed officers; they showed Mr. Betanabhatla the Formal Order purporting to designate them as officers for purposes of conducting the investigation. When counsel did get involved, counsel sent letters raising these same appointment issue and were given the back of the hand. This is the Defendants' first opportunity to challenge Commission's action after the exchange of that correspondence.

3.    The SEC Staff Investigating and Prosecuting this Case Perform
Officer Functions Without Proper Appointments.

It is nothing short of astounding for the SEC to claim that its Enforcement

Staff conducting investigations are mere employees who need not hold proper

officer appointments. As discussed in the Defendants' initial brief, the Formal Order

of Investigation purported to designate the relevant Staff as officers of the

Commission. It empowers them to preform officer functions, including

administering oaths, subpoenaing witnesses, compelling their attendance, taking

evidence, and requiring production of documents and other materials. *See* Br. at 26-

27. The SEC does not dispute that these are officer functions. Instead, the SEC

asserts, as if it were relevant, that most government employees are not officers, and

that investigative Staff do not wield the same powers as SEC ALJs and Tax Court

trial judges. Opp'n at 23-24. It also asserts that because the Commission makes

determinations about whether to bring an enforcement action, the investigative Staff

are mere employees who assist but wield no power themselves. Opp'n 18-19. These

are not serious arguments.

All executive power is vested in one person, the President of the United States.

U.S. Const. art. II, § 1. The President can delegate a portion of that power to

properly appointed officers. As a result of this delegation, each of the officers to

whom executive power is delegated will wield some portion of the executive power.

The fact that subordinate officers wield less power than their superior officers does

not change the nature of the power they wield; it merely limits the scope of their authority. The fact that SEC Staff is supervised by the Commission does not, therefore, render them mere employees; it renders them officers with less power than their supervisors. It is self-evident that all officers of the United States are not charged with the same duties. The fact that SEC ALJ's duties render them officers does not preclude a finding that other SEC officials who perform different duties are not also wielding executive power.[5]

---

[5] To bolster its assertion that only the Commission wields executive power, the SEC also claims that "it has long been settled that powers that 'are essentially of an investigative and informative nature' can be exercised by staffers who are not constitutional officers." Opp'n at 18 (citing *Buckley v. Valeo*, 424 U.S. 1, 137-38 (1976) (per curiam)). The suggestion here is that investigative Staff do not preform officer functions because they investigate and inform. And to drive that point home, in the very next three sentences, the SEC contrasts those (purportedly limited, merely investigative functions) with the power to seek judicial relief, which the SEC, again relying on *Buckley*, concedes is an executive power, but which, it points out, rest solely with the Commission. Opp'n at 18-19.

The juxtaposition of "investigative and informative" powers with the power to seek judicial relief is misleading here, to say the least. *Buckley* drew a distinction between functions relating to gathering information (investigating) for the purpose of informing legislation; functions relating to the Commission's rulemaking and advisory opinions; and "functions necessary to ensure compliance with the statute and rules—informal procedures, administrative determinations and hearings, and civil suits." *Buckley*, 424 U.S. at 137. While conceding that the legislation-related investigation may sometimes require compulsion, the Court noted that "[i]nsofar as the powers confided in the Commission are essentially of an investigative and informative nature, falling in the same general category as those powers which Congress might delegate to one of its own committees, there can be no question that the Commission as presently constituted may exercise them." *Id.* (citations omitted). In other words, the Court did not, as the SEC suggests, make a blanket assertion that all investigations and fact gathering exercises, by their nature, are not officer functions. Rather, only investigations in aid of legislation did not require

Finally, the SEC takes the position that plain statutory language should be ignored and that the word "officer" as used in the relevant authorizing provisions is not synonymous with "officer of the United States." Opp'n at 24-25. It is axiomatic that courts should strive to give operative meaning to every word in a statute. *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022). The best indication that when Congress used the term "officer" in the federal securities laws, it meant "officer"— and not something less than an "officer"—is that Congress chose to use the word "officer." *See* 15 U.S.C. §§ 77s(c) and 78u(b); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992) ("Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.") (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989)). When Congress uses the word "officer" to describe a government official, courts presume that Congress intends the word in the constitutional sense, and that

---

appointment because they were not law enforcement functions. Law-enforcement-related functions, i.e., those that entail wielding power of the person charged by the Constitution with "tak[ing] Care that laws [are] faithfully executed" U.S. CONST. art. II, § 3, include "informal procedures, administrative determinations and hearings, and civil suits" and must be carried out by properly-appointed officers. *Buckley*, 424 U.S. at 137. Here, the Formal Order of Investigation initiated a law enforcement proceeding. *See* 17 C.F.R. §203.4. Indeed, it is customary for SEC Staff to start every on-the-record testimony session with a representation that they are "officers of the Commission for purposes of these proceedings." There can be no doubt that SEC investigative "proceedings" fall within the law-enforcement bucket in *Buckley*.

Congress describes non-officers "in the service or employment of the government" with other words, like "servant" or "agent." *See United States v. Germaine*, 99 U.S. 508, 510 (1878); *United States v. Maurice*, 2 MARSHALL'S C.C. 96 (C.C.D. Va. 1823) ("An office is defined to be 'a public charge or employment,' and he who performs the duties of the office, is an officer. If employed on the part of the United States, he is an officer of the United States."). [6]

### 4.   The SEC's Ratification Argument Fails.

The SEC's claim that Staff actions have been ratified misses the point. As a start, the SEC cannot rely on the Ninth Circuit decision in *Seila Law* on remand because the issue there was whether the head of the department who was not insulated from presidential oversight could ratify actions of her predecessor who was. *See CFPB v. Seila Law LLC*, 997 F.3d 837 (9th Cir. 2021). For the reasons discussed above, because the SEC is insulated from presidential oversight, it cannot act, let alone ratify actions of others.

---

[6] Note that in addition to reciting in testimony that they are officers of the Commission, SEC Enforcement Staff also sign subpoenas as officers of the Commission. Given these representations and the content of the Commission formal orders, the SEC's assertion that its investigative Staff are mere employees makes even less sense. By stating that they are officers of the Commission, SEC Staff are invoking the power if an executive agency. That agency's power derives from the President's Article II power; there is no other source. Therefore, stating that one is an officer of the Commission is admitting that one is wielding the power of the Executive and invoking that power. Put differently, the representation that SEC Staff are officers of the Commission is also an admission that they are officers of the United States.

As well, the Ninth Circuit decision left open the question of the consequences of any such ratification. It is clear from that court's discussion that it thought that the ratification was sufficient for enforcing prospective compliance with a subpoena and conducting an investigation following the ratifications. But it is far from clear that the Ninth Circuit agreed that the ratification dates back to the time of the original subpoena. *See CFPB v. Seila Law*, 997 F.3d at 847-48 (refusing to entertain Seila Law's statute of limitations defense, stating that the question of whether that defense is available was not ripe until the investigation was completed).

With that said, Ninth Circuit precedent is not binding on this Court. And the dissent in that case makes a better argument. It notes first that the Supreme Court is clear that "parties injured by action of a constitutionally defective executive official are 'entitled to relief.'" *Id.* at 843 (Bumatay, J., dissenting) (citing *Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018)) Ratification would, country to the Court's admonition, render meaningless any such relief. *Id.* (citing *Lucia*, 138 S. Ct. at 2055 n.5 and noting that the relief ordered there was a new hearing before a different, properly-appointed ALJ, "even though the SEC had ratified the appointment of the then-unconstitutionally serving ALJ who had ruled against Lucia.")

Next, the dissent points out that because the CFPB was not properly instituted at the relevant time, it was unable to issue its investigative demand when it did and so it could not now ratify something it could not have done in the first place. *Id.* This

is so because the ratification doctrine is derived from agency law and presupposes that the agent did not have proper authority from its principal to act when he or she acted. For effective ratification, the principal must have had requisite authority to empower the agent both at the time of the agent's action and at the time of ratification. *See Marsh v. Fulton Cty.*, 77 U.S. (10 Wall.) 676, 684 (1870) (ratification "operates upon the act ratified in the same manner as though the authority of the agent to do the act existed originally"); *see generally CFPB v. Seila Law* LLC, 997 F.3d at 839-45 (Bumatay, J., dissenting). This argument is particularly applicable to the SEC. The SEC is a Commission composed of its members; if its members' appointments are defective, there is no Commission. If there is no Commission, the Commission cannot act. Therefore, even if the Commission were not insulated from presidential supervision now, it could not ratify past actions that took place when it was not properly instituted.

Finally, as we already laid out, Br. at 28-29, one cannot empower someone to wield executive power without a proper *appointment* (in contrast to a defect based on improper insulation); it is the appointment that imbues one with the requisite power. The SEC does not and cannot dispute that all actions of officers who are not properly appointed are void *ab initio*. *See Lucia*, 138 S. Ct at 2051; *Collins*, 141 S. Ct. at 1170. *See also* Br. at 28-29. They are a legal nullity; it is as if they did not take place. And one cannot appoint someone retroactively as if the appointment happened

in the past. If that were possible, the appointments clause would be entirely eviscerated. This is why, as the Ninth Circuit dissent noted, Lucia was entitled to a new hearing before a different, properly-appointed ALJ. Here, none of the relevant Staff was appointed; all their actions are void and cannot be ratified. The product of their actions is also a nullity, and, to the extent their actions led to the filing of this enforcement action, the action is tainted and must be dismissed.[7]

## CONCLUSION

For all reasons presented in Defendants' Motion and reply, Defendants respectfully request that this Court dismiss 1) the entire Complaint on constitutional grounds as well as 2) the fraud claims to the extent set forth in Defendants' Motion.

---

[7] The SEC also argues that the Director of Enforcement ratified the Staff's actions. Opp'n 21-22. As we pointed out in our initial brief, the Director cannot make appointments and cannot ratify them. Br. at 29 n.20. It is also not clear how the Director could ratify all investigative steps taken by the Staff if all he did was ratify the Formal Order. *See* Opp'n at 22. There is no indication in the SEC opposition that he was even informed of any investigative steps that were taken. It is therefore also not clear what it is that he thinks he ratified.

Finally, the SEC opposition makes a curious assertion that the Director serves at the pleasure of the Commission. Opp'n at 22. As we pointed out, all SEC employees, including the Director, are covered by protections against removal at will contained in 5 U.S.C. § 4807. Br. at 30 n.23. By its silence in response, the SEC appears to concede that we are correct. Indeed, one would find it surprising to learn that a federal employee who is not a presidential appointee in the Executive Branch has no protections from removal, especially where, as here, his boss does. In any event, the Director must be removable by *the President*—because that is where all executive power resides—that he serves at the pleasure of the Commission, which is itself insulated from presidential oversight, is neither here nor there.

Dated: February 1, 2023

Respectfully submitted,

**LIPMAN LAW PLLC**

_/s/ Alex Lipman_
Alex Lipman (admitted _pro hac vice_)
147 West 25th Street, 12th Floor
New York, New York 10001
Phone: (212) 401-0070
alexlipman@lipmanpllc.com

**SMYSER KAPLAN & VESELKA, L.L.P.**

Hector R. Chavez
State Bar No. 24078335
S.D. ID No. 1364992
David Isaak
State Bar No. 24012887
S.D. ID No. 26694
717 Texas Avenue, Suite 2800
Houston, Texas 77002
Phone: (713) 221-2300
Fax: (713) 221-2320
disaak@skv.com
hchavez@skv.com

**LAW OFFICE OF DANIEL F. WACHTELL**

Daniel F. Wachtell _(of counsel, pro hac vice forthcoming)_
90 Broad Street, 23rd Floor
New York, New York 10004
Phone: (917) 667-6954
dan@danwachtell.com

**ATTORNEYS FOR DEFENDANTS RAMAS CAPITAL MANAGEMENT, LLC AND GANESH H. BETANABHATLA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2023 copies of this document are being served all counsel of record via the Court's ECF/CM system.

*/s/ Hector R. Chavez*

Hector R. Chavez